1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DANIEL ALEM,

            Plaintiff,

    v.

ERIC ARNOLD,

            Defendant.

Case No.  3:15-cv-03649-WHO

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Re: Dkt. No. 1

**INTRODUCTION**

Petitioner Daniel Alem ("petitioner") seeks federal habeas relief from state court convictions for attempted second degree robbery, attempted murder, and assault with a semiautomatic firearm.  Alem challenges his convictions on the grounds that the CALCRIM No. 1600 instruction on robbery, modified to include a "safe haven" instruction, lessened the prosecutor's burden of proof in violation of Alem's Sixth Amendment and due process rights.  Because the state court that reviewed Alem's claim reasonably applied the test for constitutional error stemming from instructional error, his petition is DENIED.

**BACKGROUND**

**I.  Procedural Background**

On June 26, 2012, an Alameda County jury found petitioner guilty of one count of attempted murder (Cal. Pen. Code § 187(a)), one count of attempted robbery (Cal. Pen. Code § 211), and one count of assault with a semi-automatic firearm (Cal. Pen. Code § 245(b)).  Respondent's Answer to the Court's Order to Show Cause ("Answer"), Ex. 1, Clerk's Transcript ("CT") at 213-216 (Dkt. No. 12-1).  He received a sentence of 32 years to life: seven years for attempted murder, two years for attempted robbery, six years for assault with a semi-automatic

1    firearm, and 25 years to life for a section 12022.53(d) enhancement.  CT at 231; Pet. at p-1 (Dkt.

2    No. 1).  In February 2014, the California Court of Appeal affirmed the judgment.  Answer, Ex. 6,

3    Opinion of the California Court of Appeal ("CCA Op.") (Dkt. No. 12-11 at 75).  In April 2014,

4    Alem filed a petition for review with the California Supreme Court.  Answer, Ex. 7 (Dkt. No. 12-

5    11 at 85).  The California Supreme Court denied review in May 2014.  Answer, Ex. 8 (Dkt. No.

6    12-11 at 128).  This federal habeas petition followed, raising the same issues raised in his direct

7    appeal.

8    **II.  Factual Background**

9         **A.  The Facts of the Case**

10        The evidence before the state court included statements and testimonies made by Alem, the

11   victim Natsagdorj Gantumur, the police, and third-party witnesses, including one eye witness.

12   Based on the evidence, the California Court of Appeal summarized the facts of the case as

13   follows:

14            A. *Prosecution Case*

15            Natsagdorj Gantumur, a native of Mongolia who came to the United
             States in 2001, was walking at 11:00 p.m. on December 1, 2010. He
16            was on Madison Street in Oakland, going to visit a friend. At the
             time, he was texting on his cell phone. Defendant approached
17            Gantumur and grabbed the cell phone from him, running away.
             Gantumur had not dropped his phone before the snatch by
18            defendant.

19            Gantumur chased after defendant, yelling, "Give me back my
             phone." He caught up with defendant at the intersection of 15th and
20            Madison Streets. As Gantumur confronted defendant, defendant
             turned, facing Gantumur and pulled gun [sic] from his jacket. He
21            pointed the weapon at Gantumur.

22            Thinking defendant was going to shoot him, Gantumur grabbed the
             hand holding the weapon, pushing it away from his torso. Once
23            Gantumur physically moved the hand down to defendant's side,
             defendant began firing the weapon. With this, Gantumur pushed
24            defendant to the ground and Gantumur fell on top of him.

25            Defendant kept firing the gun. Gantumur began hitting him in the
             face with his fist while using his other hand to restrain the hand
26            holding the weapon. Eventually, defendant stopped firing because
             the weapon was empty. Gantumur knew this when he heard the
27            clicking sound of the weapon. When this happened, Gantumur
             grabbed the gun from defendant and punched him in the face. The
28            two men both stood up and defendant asked for his gun back.

United States District Court
Northern District of California

Gantumur noticed he had been wounded on his left side from the gun fire. He saw his cell phone on the ground in pieces and picked them up. In fact, Gantumur returned the weapon to defendant, who took it and then ran north on Madison Street.

When Gantumur was interviewed by the police at the hospital, he provided an account of the incident. In his statement he indicated he chased defendant after the phone was taken. According to the police statement, when Gantumur caught up with defendant, he took his phone back. Defendant started to fight him so Gantumur punched defendant. Only then did defendant pull out his gun. Gantumur did acknowledge being handed a copy of his statement at the hospital for review but he was suffering from the injury at the time; he was not concerned about the order of the narrative in the police report. Gantumur, when he testified, disagreed with the chronology contained in the police statement.

[…]

B. *Defense Case*

Defendant testified he was going to a friend's house when Gantumur came up to him. Gantumur dropped his cell phone near defendant. Defendant picked it up and handed it to Gantumur. As he picked it up, Gantumur began yelling, "Give me my phone, give me my phone." Defendant asked Gantumur, "Dude, why are you tripping?" With this remark, Gantumur punched defendant in the eye. Gantumur charged at defendant and the two men fell to the ground, with Gantumur hitting defendant in the face. To protect himself, defendant pulled out his gun and fired warning shots. He only

intended to scare Gantumur.

As he got up, Gantumur grabbed the weapon from defendant. Defendant asked for the gun back as he picked Gantumur's phone up off the ground. Accepting his phone from defendant, Gantumur returned the gun to him. Defendant then walked away from the scene. As he left, defendant tossed the gun in the bushes. Defendant was concerned the police might find the gun on his person.

When he was arrested by Officer Martin, defendant did not advise him he had been assaulted by another person. At the police station, defendant spoke with Officer Phong Tran. Tran asked defendant how he injured his eye, to which defendant replied that someone tried to rob him.

Defendant acknowledged he purchased the gun approximately one year before the incident with Gantumur. He carried two magazines because he might find it necessary to reload the weapon quickly.

The defense maintained there was no trespassory taking here. Rather, defendant simply picked up Gantumar's phone from the ground. Gantumur then became suddenly hostile and started hitting defendant. This triggered the need for defendant to pull out his gun in self-protection. His counsel requested and received defense instructions on the scope of self defense.

1   CCA Op. at 2-5 (Dkt. No. 12-11 at 77-80).

2   **B.  The Trial Court's Jury Instructions**

3   In the trial court, the judge indicated that she was going to advise the jury pursuant to

4   CALCRIM No. 1600, the robbery jury instruction.  The prosecutor requested that the court advise

5   the jury that the "application of force or fear may be used when taking the property or when

6   carrying it away."  Answer, Ex. 2, Reporter's Transcript ("RT"), at 806 (Dkt. No. 12-8 at 139).

7   The prosecutor also asked the court to instruct the jury that "a theft or robbery remains in progress

8   until the perpetrator has reached a place of temporary safety," arguing that it was "essential to this

9   case that the jury understand for the use clause that the robbery is still ongoing while the defendant

10  remains on the scene before he has reached a place of safety."  RT at 806-807.  At first, the court

11  observed that "pinpoint evidence is typically not allowed when the circumstances of the case do

12  not suggest a need for further clarification."  RT at 807.  Defense counsel objected to the proposed

13  instructional language for the same reason.  RT at 809.  However, after reviewing additional case

14  law regarding the requested instruction, the court concluded that "the cases really do speak to the

15  fact that the crime of robbery is continuing to occur until the perpetrator is safe."  RT at 818.

16  Thus, the court advised the jury pursuant to CALCRIM No. 1600, with the additional pinpoint

17  language:

18  
19      To prove the crime of robbery, the People must prove, one, that the
        defendant took property that was not his own;

20      Two, the property was taken from another person's possession and
        immediate presence;

21      Three, the property was taken against that person's will;

22  
23      Four, the defendant used force or fear to take the property or prevent
        the person from resisting;

24      And [five], when the defendant used force or fear to take the
        property, he intended to deprive the owner of it permanently;

25      The defendant's intent to take the property must have been formed
26      before or during the time he used force or fear. If the defendant did
        not form this required intent until after using the force or fear, then
        he did not commit robbery.
27      […]

28      *The application of force or fear may be used either when taking the*

4

1

*property or when carrying the property away.*

*And the crime of robbery remains in progress, ladies and gentlemen, until the perpetrator has reached a place of temporary safety.*

2

3     RT at 909 (emphasis added).[1]

4         **C.  The Appellate Court's Opinion**

5         The appellate court found that the instruction given by the trial court was "a correct

6     statement of the pertinent law needed to decide this case."  CCA Op. at 7 (Dkt. No. 12-11 at 82).

7     The court provided:

8              We begin our assessment of the court's instruction with the
       understanding the crime of robbery is a continuing offense. (*People
9      v. Gomez* (2008) 43 Cal.4th 249, 254 (*Gomez*).)  As such the crime
       continues until all the elements are satisfied. (*Ibid.*)  Asportation or
10     carrying the property of the victim away is an element of the crime.
       It continues until the suspect reaches a place of temporary safety
11     with the property. (*Id.* at p. 255; *People v. Flynn* (2000) 77
       Cal.App.4th 766, 772.)
12
               Additionally, the element of "force or fear" need not arise only in
13     the act of taking the property of another.  Carrying away another's
       property in itself may satisfy the evidence of "force or fear" if that is
14     when this particular element takes place during the robbery act.  "A
       robbery is not completed at the moment the robber obtains
15     possession of the stolen property.  The crime of robbery includes the
       element of asportation, the robber's escape with the loot being
16     considered as important in the commission of the crime as gaining
       possession of the property. . . . [A] robbery occurs when defendant
17

18     ―――――――――――――
       [1] The appellate court described the trial court's deliberation over adding the "safe haven"
19     language:

20             The trial court at first was not inclined to add additional language to
       CALCRIM No. 1600.  She believed the incident at trial was all part
21     of the continuous act of taking Gantumur's phone.  The force was
       ongoing.  There was no need for the clarification sought by the
22     prosecutor.  The defense agreed with the court's observation,
       stating, "I object to it [the modification of CALCRIM No. 1600] for
23     the reasons you stated"; i.e., it was unnecessary and repetitive.
       However, the court decided to take the matter under submission.
24
               After review, and before instructing the jury, the judge indicated the
25     cases do include the transportation of the property to a place of
       safety within the scope of robbery.  She noted, "'The crime of
26     robbery remains in progress until the perpetrator has reached a place
       of temporary safety.'"  When the court announced the reasons for
27     giving the modification based on her review of the case law, defense
       counsel expressed no objection.
28
       CCA Op. at 5-6 (Dkt. No. 12-11 at 80-81).

United States District Court
Northern District of California

uses force or fear in resisting attempts to regain the property . . . regardless of the means by which defendant originally acquired the property." (*People v. Estes* (1983) 147 Cal.App.3d 23, 27-28 (*Estes*); *People v. Anderson* (1966) 64 Cal.2d 633, 638.)

In our case, the evidence is uncontradicted defendant obtained possession of Gantumur's cell phone without permission; he snatched it from his hand.  As the defendant ran away with the stolen property, Gantumur chased him.  When Gantumur caught up with him, defendant turned around and pointed the handgun at his torso.  The struggle then followed.  In other words, in his escape to a place of safety, when confronted by the victim of the theft, defendant evidenced "force or fear" by brandishing the firearm at Gantumur.  Under *Gomez* and *Estes*, the element of "force or fear" was satisfied during the asportation of the stolen property.  (See also *People v. Villa* (2007) 157 Cal.App.4th 1429, 1433.)  Once the two men struggled after Gantumur was confronted by defendant with the weapon, the victim sustained serious wounds from the discharge of the weapon, such evidence only magnifying the "force or fear" element for robbery.

CCA Op. at 7-8 (Dkt. No. 12-11 at 82-83).

The appellate court also discussed Alem's reliance on *People v. Hodges*, 213 Cal.App.4th 531 (2013) and found that *Hodges* was distinguishable:

In his briefing, defendant relies on the recent case *People v. Hodges* (2013) 213 Cal.App.4th 531 (*Hodges*).  We find *Hodges* inapposite to the issues in this case.  Simply stated, *Hodges* involved a grocery store shoplifting scenario where the guard approached the suspect who was entering his car.  The guard advised the suspect he had not paid for the items and needed to return to the store.  Hodges claimed he lost the receipt but told the guard he did not want the items and tossed the goods at the guard's partner who had now approached.  (*Id*. at pp. 535-536.)  Hodges also pushed the partner back, causing the security officer to land against another car.  Again, the pushing and relinquishment of the groceries took place after Hodges announced he did not want the goods from the store. (*Id*. at p. 536.)

During argument, counsel for Hodges contended evidence of "force or fear" was absent in the case because his client had relinquished the property before any pushing or tossing of groceries had taken place.  The court refused to advise the jury regarding the impact of abandonment of the property before the evidence of "force or fear" is present. (*Hodges*, *supra*, 213 Cal. App. 4th at p. 537.)  During deliberations, the jury sent out a specific question on the effect of abandoning the stolen property before the first instance of force or fear occurred.  The court, over objection by defense counsel, advised the jury the incident in the parking lot, even with the abandonment of the stolen property by Hodges, could be viewed as a continuation of the robbery because the accused had not reached a place of temporary safety.  (*Id*. at p. 538.) This was erroneous. (*Id*. at pp. 542-543.)

Under our facts, the prosecution's theory was the taking here

6

1
2
3
4
5

escalated into a robbery because defendant never offered to return the victim's cell phone.   Instead, he threatened to keep it at gunpoint.  The defense focused on defendant's courteous efforts to hand over Gantumur's dropped phone and the aggressive reaction of the owner.  The defense did not develop a theory of abandonment of a trespassory taking as was presented in *Hodges*.   Instead, defendant's focus was on misunderstanding and then self-defense. The jury's verdict, after proper instructions, was based on their assessment of the evidence.   Also, they had the benefit of the testimony of both Gantumur and defendant in reaching the verdict.

6   CCA Op. at 8-9 (Dkt. No. 12-11 at 83-84).

7   **LEGAL STANDARD**

8   Under the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal

9   district court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

10   pursuant to the judgment of a State court only on the ground that he is in custody in violation of

11   the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may

12   not be granted with respect to any claim that was adjudicated on the merits in state court unless the

13   state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved

14   an unreasonable application of, clearly established Federal law, as determined by the Supreme

15   Court of the United States; or (2) resulted in a decision that was based on an unreasonable

16   determination of the facts in light of the evidence presented in the State court proceeding."  28

17   U.S.C. § 2254(d).

18   "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

19   arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if

20   the state court decides a case differently than [the] Court has on a set of materially

21   indistinguishable facts."  *Williams  v. Taylor,* 529 U.S. 362, 412–13 (2000).

22   "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if

23   the state court identifies the correct governing legal principle from [the] Court's decisions but

24   unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  "[A] federal

25   habeas court may not issue the writ simply because that court concludes in its independent

26   judgment that the relevant state-court decision applied clearly established federal law erroneously

27   or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  A federal habeas

28   court making the "unreasonable application" inquiry should ask whether the state court's

United States District Court
Northern District of California

1   application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

2   The Due Process Clause requires the prosecution to prove every element charged in a criminal

3   offense beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 364 (1970). Any jury

4   instruction that "reduce[s] the level of proof necessary for the Government to carry its burden… is

5   plainly inconsistent with the constitutionally rooted presumption of innocence." *Cool v. United*

6   *States*, 409 U.S. 100, 104 (1972).

7        To obtain federal collateral relief for errors in the jury charge, a petitioner must show that

8   the deficient instruction by itself so infected the entire trial that the resulting conviction violates

9   due process. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). The instruction may not be judged in

10  artificial isolation, but must be considered in the context of the instructions as a whole and the trial

11  record. *Id.* In other words, the court must evaluate jury instructions in the context of the overall

12  charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152,

13  169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)); *Prantil v. California*, 843 F.2d

14  314, 317 (9th Cir. 1988).

15                                    **DISCUSSION**

16        Alem asserts that the trial court's jury instructions "violated [his] Sixth Amendment and

17  due process rights to a fair trial," Pet. at p-10, but focuses his argument on an alleged deprivation

18  of due process. Pet. at m-3. As such, I presume that Alem asserts a claim for relief under the due

19  process clause of the Fourteenth Amendment.

20        "[T]he Due Process Clause protects the accused against conviction except upon proof

21  beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

22  charged." *In re Winship*, 397 U.S. at 364. To grant habeas relief, the federal court must find that

23  "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

24  process." *Estelle*, 502 U.S. at 72. That is not the case here. The California Court of Appeal

25  reasonably determined that "the instruction given by the trial court in this case was a correct

26  statement of the pertinent law needed to decide this case." CCA Op. at 7 (Dkt. No. 12-11 at 82).

27        Alem first asserts that the "safe haven" instruction was unwarranted because the evidence

28  shows that he, like the defendant in *Hodges*, relinquished the owner's property before any force or

United States District Court
Northern District of California

1   fear was used.  Pet. at m-3 to m-4.  Alem then argues that the "safe haven" instruction

2   "'eviscerated' the fourth and fifth elements requiring that the defendant use force or fear to

3   effectuate the taking or prevent resistance and also that the use of force occur while the defendant

4   intended to permanently deprive the owner of the property."  Pet. at m-4.  "Because of the

5   erroneous instruction, the jury believed it could find petitioner guilty of attempted robbery even if

6   he had returned the cell phone, as he had yet to reach a place of safety."  *Id.*  He alleges that "[t]his

7   error was not harmless beyond a reasonable doubt, and clearly contributed to [his] conviction."

8   Pet. at m-6 to m-7.  According to Alem, the jurors should have been instructed that "if petitioner

9   had returned the cell phone to Mr. Gantumur, as much of the evidence suggests, he could not be

10  found guilty of robbery."  Pet. at m-8.

11      Alem then turns to his conviction for attempted murder.  He states, "[t]he issue of whether

12  a robbery was ongoing at the time petitioner used force was an extremely important factor in the

13  determination of whether petitioner was acting in self-defense at the time he fought with Mr.

14  Gantumur."  Pet. at m-10.  "[T]he trial court's instruction improperly told the jury that petitioner

15  was engaged in a robbery until he reached a place of safety."  *Id.*  Because "ample evidence…

16  suggests that Mr. Gantumur and not petitioner was the initial aggressor… [i]t cannot be said

17  beyond a reasonable doubt that the jury would have rejected petitioner's claim of self-defense, had

18  they been properly instructed as to the relevant law."  *Id.*

19      Respondent begins by pointing out that Alem does not challenge the validity of the "safe

20  haven" instruction, but rather argues that the instruction should not have been given at all.

21  Answer at 13.  Respondent then distinguishes *Hodges*, "in *Hodges*, evidence of the defendant's

22  attempt to return the property prior to the use of force was uncontroverted."  *Id.*  Respondent also

23  points out that Alem "asserts no theft occurred at all."  *Id.*  Thus, "petitioner's claim of handing

24  the phone to Gantumur could not constitute a surrender of stolen goods prior to the use of force as

25  in *Hodges*."  *Id.*[2]

26

27  ─────────────────

[2] The only contention that Alem makes in his Traverse is that *Hodges* is applicable even if Alem
alleged that no theft occurred.  Traverse at 4.  Alem states that *Hodges* was not decided until after
28  his trial court conviction and that the jury instruction was improper under *Estes*, the controlling
law at the time.  *Id.*  "[I]t was not until *Hodges* that the California court addressed the effect of a

## I.   THE COURT OF APPEAL REASONABLY DETERMINED THAT THE SAFE HAVEN INSTRUCTION WAS PROPER

The California Court of Appeal reasonably determined that "the instruction given by the trial court in this case was a correct statement of the pertinent law needed to decide this case." CCA Op. at 7 (Dkt. No. 12-11 at 82).  The trial court considered the conflicting evidence concerning when Gantumar retrieved his phone and when the force occurred, researched the applicable case law, and concluded that the "safe haven" instruction was proper.  RT at 806–818 (Dkt. No. 12-8 at 139).  If a court is presented with conflicting evidence, it may properly give the "safe haven" instruction as long as there is substantial evidence to support it.  *See, e.g., People v. Marshall*, 15 Cal. 4th 1, 39 (1997); CALCRIM Nos. 3146, 3261; *People v. Cavitt*, 33 Cal. 4th 187, 208 (2004)).  Respondent states, "[A]bsent uncontroverted evidence showing intent to surrender the stolen property as in *Hodges*, the safe haven instruction was applicable… Thus, the jury instruction was supported by substantial evidence and was properly given."  Answer at 16.

*Hodges* is clearly distinguishable from this case.  As the appellate court and respondent correctly note, the only reason the "safe haven" instruction was rejected in *Hodges* was because there was uncontradicted evidence that the defendant relinquished the stolen goods before using force or fear.  *See Hodges*, 213 Cal. App. 4th  at 536.  *Hodges* focused on the legal impact of the defendant's undisputed surrender of the goods prior to the use of force.  *Id*. at 542.  Here, there is conflicting testimony as to when Alem evidenced force or fear, or if he did so at all.  CCA Op. at 83 ("[T]he prosecution's theory was the taking here escalated into a robbery because defendant never offered to return the victim's cell phone.  Instead, he threatened to keep it at gunpoint.  The defense focused on defendant's courteous efforts to hand over Gantumur's dropped phone and the aggressive reaction of the owner.").  In light of the evidentiary dispute and the differences between the defense theories in *Hodges* and this case, the appellate court reasonably concluded that *Hodges* was inapplicable.[3]

---

defendant surrendering possession of the property *before* he used force." *Id*. Thus, Alem alleges that *Hodges* requires that his conviction be overturned.

[3] Petitioner makes much of the fact that *Hodges* came out after petitioner's conviction. *See* Traverse (Dkt. No. 19-1).  But the *law* cannot change the *facts* of this case: petitioner presented his version of events (i.e., Gantumur dropped the phone, Alem picked it up and attempted to

The "safe haven" instruction was proper because it was supported by substantial evidence and a reasonable interpretation of state law. *People v. Marshall*, 15 Cal. 4th 1, 39 (1997) (finding a trial court may give a requested instruction "if it is supported by substantial evidence") (citations omitted); *Estelle*, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Here, the trial court adopted the "safe haven" instruction after finding that "the cases really do speak to the fact that the crime of robbery is continuing to occur until the perpetrator is safe." RT at 818 (Dkt. No. 12-8 at 151). The appellate court affirmed that the instruction "was a correct statement of the pertinent law needed to decide this case." CCA Op. at 7 (Dkt. No. 12-11 at 82). It explained that under *Gomez* and *Estes*, the crime of robbery is a continuing offense that ends when the suspect reaches a place of safety. *Id*. (citing *People v. Gomez*, 43 Cal.4th 249, 254-55 (2008) and *People v. Flynn*, 77 Cal.App.4th 766, 772 (2000)). As such, the "force or fear" element may arise at any point during the robbery, including the taking, asportation, or attempt to maintain possession of the property. *People v. Estes*, 147 Cal.App.3d 23, 27-28. The appellate court found that there was substantial evidence (i.e., "uncontradicted" evidence) that "in [Alem's] escape to safety, when confronted by the victim of the theft, [Alem] evidenced 'force or fear' by brandishing the firearm at Gantumur." CCA Op. at 7 (Dkt. No. 12-11 at 82). Thus, "[u]nder *Gomez* and *Estes*, the element of 'force or fear' was satisfied during the asportation of the stolen property." *Id*. In reaching its conclusion, the appellate court correctly viewed the context of the overall charge in deciding that "the instruction [was] a correct statement of the law and applies to the facts of this case." CCA Op. 1 (Dkt. No. 12-11 at 76). *See Estelle*, 502 U.S. at 72; *Frady*, 456 U.S. at 169.[4]

## II.  EVEN IF THE INSTRUCTION WAS IMPROPER, IT DID NOT "SO INFECT THE TRIAL" THAT IT AMOUNTED TO A VIOLATION OF DUE PROCESS

The "safe haven" instruction, viewed in context of the instructions as a whole, could not have "so infected the entire trial that the resulting conviction violates due process." *See Estelle*,

---

"surrender" it to Gantumur), and the jury rejected it. CCA Op. 8-9 (Dkt. No. 12-11 at 83-84).

[4] Respondent also cites authorities suggesting that the safe haven instruction is proper when there is a dispute as to the duration of the attempted robbery involving the use of a firearm. Answer at 15 (citing CALCRIM Nos. 3146, 3261; *People v. Cavitt*, 33 Cal.4th 187, 208 (2004).

United States District Court
Northern District of California

1    502 U.S. at 72.  For one thing, the jury was explicitly instructed that not all instructions may

2    apply.  The trial court instructed the jury, pursuant to CALCRIM 200, that:

3           Some of these instructions may not apply, depending on your
            findings about the facts of the case.  Do not assume just because I
4           give a particular instruction that I am suggesting anything about the
            facts.   After  you  have  decided  what  the  facts  are,  follow  the
5           instructions that do apply to the facts as you find them.

6    CT at 161 (Dkt. No. 12-3 at 166).  The jury was advised to reject the "safe haven" instruction if it

7    did not apply to the facts.

8           Moreover, the evidence—conflicting facts and all—supported the trial court's decision to

9    give the "safe haven" instruction.  Petitioner insists that the instruction was not factually supported

10   and therefore allowed the jury to find him guilty of robbery absent the force or fear element.  Pet.

11   at m-4 (Dkt. No. 1 at 19).  Alem testified that he did not steal the phone, but rather tried to return it

12   after Gantumur dropped it on the ground.  Pet. at 8-9; CCA Op. at 8 (Dkt. No 12-11 at 83)("The

13   defense focused on defendant's courteous efforts to hand over Gantumur's dropped phone and the

14   aggressive reaction of the owner.  The defense did not develop a theory of abandonment of a

15   trespassory taking... .").  Under this set of facts, the jury could have found no robbery occurred at

16   all, making the force or fear element immaterial.  The jury found Alem guilty of attempted

17   robbery, showing that it credited Gantumur's testimony over Alem's.  Thus, the disputed

18   instruction did not have "substantial or injurious effect" on the jury's verdict.[5]

19          Lastly, the prosecution was entitled to argue the state's version of events in its closing

20   argument.  The jury heard all the evidence, determined which of the court's given instructions

21   should apply, and decided to convict the petitioner of all counts.  Even if the instruction was given

22   in error, the jury verdict demonstrates that it credited Gantumur's testimony.  Alem's petition,

23   when viewed in light of the trial record as a whole, does not support a finding that the safe haven

24   instruction so infected the proceedings that his conviction violates due process.

25                                        **CONCLUSION**

26          The Court of Appeal's adjudication of Alem's claims did not result in decisions that were

27   _____

28   [5] Because Alem's argument regarding his attempted murder conviction completely depends on the
     success of his robbery argument, described above, that claim fails as well.

United States District Court
Northern District of California

1   contrary to, or involved an unreasonable application of, clearly established federal law.

2   Accordingly, the petition is DENIED.

3          A certificate of appealability will not issue as reasonable jurists would not "find the district

4   court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S.

5   473, 484 (2000). Alem may seek a certificate of appealability from the Ninth Circuit Court of

6   Appeals.

7          The clerk shall enter judgment in favor of respondent and close the file.

8          **IT IS SO ORDERED**.

9   Dated: December 6, 2016



    WILLIAM H. ORRICK
    United States District Judge